IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Victoria Yaitsky, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | C.A. No.: 2:04-cr-1097-PMD |
| v. | ) | |
| | ) | **ORDER** |
| United States of America, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

This matter is before the court upon Petitioner Victoria Yaitsky's ("Yaitsky" or "Petitioner") Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255. For the following reasons, the court denies Yaitsky's motion and grants the Government's Motion for Summary Judgment.

## BACKGROUND

On December 8, 2004, a federal grand jury returned a one-count indictment charging Petitioner with murder-for-hire in violation of 18 U.S.C. § 1958(a). (*See* Indictment.) Yaitsky filed a Motion to Suppress on May 23, 2005, seeking an order of the court suppressing "the interception of certain tape recorded conversations that . . . violate the prohibitions of 18 U.S.C. 2511(2)(d) and 18 U.S.C. 2515." (Mot. to Suppress.) The court held a hearing on the Motion to Suppress on May 31, 2005, in which it denied the motion.

A jury trial was held on May 31, 2005, through June 3, 2005. During the course of trial, on June 2, 2005, the Government filed a Motion to Exclude Evidence, seeking an order of the court excluding Yaitsky's expert witness testimony as being in violation of Rule 16(b)(1)(C) of the Federal Rules of Criminal Procedure. The Government's motion states that on April 4, 2005, the day before jury selection was to be held, Yaitsky requested the trial be continued beyond the

scheduled trial date of May 3, 2005, because she had retained an expert witness who was to render his opinion as to the authenticity of certain audio recording evidence. (*See* Mot. to Exclude at 1.) The court granted the continuance and set the trial date for May 31, 2005. The Government's Motion to Exclude indicates that Yaitsky's counsel never provided the written summary requested by the Government but that the court ordered Yaitsky to produce the expert for an interview with the Government's attorneys. (*Id.* at 2.) Although the interview took place on the evening of June 1, 2005, the Government indicates Yaitsky's attorneys "abruptly and profanely" announced they were leaving and taking their expert with them after only twenty minutes. (*Id.* at 3.) The motion further states,

> The expert maintained that the conclusion that he reached on April 7, 2005 with regard to the audio recordings has remained unchanged since that time. It was also apparent that the expert's testimony to be offered would be well-beyond the scope and content of the brief oral summary previously rendered by the Defendant's attorney. The expert informed the government for the first time that he had performed specific scientific experiments on the subject audio recordings. These experiments, in part, formed the basis of his ultimate opinion. Further, the expert stated he would testify that the methods employed by the FBI in reproducing the audio recordings were subject to criticism and impacted his opinion as to the authenticity of the recordings. The government had not in any manner whatsoever been previously advised that such would be a basis for the expert's opinion. When asked specifically about that basis for his opinion and its importance, the expert refused to answer the government's questions and replied "you can ask me that in court."

(*Id.* at 2-3.) The court heard argument on the motion, and Yaitsky's counsel "conceded that the motion should be granted." (*See* Pet. at 5.) The expert's testimony was thus not presented to the jury.

The jury returned a verdict of guilty on June 3, 2005, and Yaitsky's sentencing hearing was held on January 3, 2006. Petitioner was sentenced to a term of imprisonment of 120 months, and she was ordered to pay a special assessment fee of $100.00. Yaitsky filed a Notice of Appeal on

2

January 19, 2006, and on appeal, she asserted the district court abused its discretion when it denied her Motion to Suppress audio recordings made by Igors Smolakovs. However, the United States Court of Appeals for the Fourth Circuit affirmed the judgment of the district court. Yaitsky filed the instant Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 on November 21, 2007.

## STANDARD OF REVIEW

Yaitsky proceeds under 28 U.S.C. § 2255, which provides, in relevant part:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a). On a motion to vacate, set aside, or correct a sentence pursuant to 28 U.S.C. § 2255, the petitioner bears the burden of proving the grounds for collateral attack by a preponderance of the evidence. *Miller v. United States*, 261 F.2d 546, 547 (4th Cir. 1958). In deciding a § 2255 motion, the court need not hold a hearing if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). The court has thoroughly reviewed the motion, files, and records in this case and finds that no hearing is necessary.

## ANALYSIS

Yaitsky lists fourteen grounds for relief in her § 2255 petition, and she has also attached a Memorandum in Support of her motion. The grounds and supporting facts are as follows:

> **GROUND ONE**: Mrs. Yaitsky's trial counsel rendered ineffective assistance of counsel by failing to timely disclose a defense expert witness.

3

Supporting facts: Mrs. Yaitsky's trial attorneys were ineffective for failing to timely disclose a defense expert as a witness. As a result, Mrs. Yaitsky was denied her right to effective assistance of counsel in violation of the Fourth, Fifth, Sixth, and Eighth Amendments to the Constitution. But for counsel's ineffectiveness, the result of the proceeding would have been different.

The central pieces of the Government's evidence were digital audio recordings made by Igors Smolakovs without governmental monitoring. He kept these recordings in his possession for a sufficiently long period of time, which allowed him to alter them before handing them over to the FBI. Prior to trial, defense counsel retained Steve Cain as an expert witness to analyze the tapes for potential tampering. Mr. Cain found signs of tampering. However, at trial, the Government moved to dismiss Mr. Cain's testimony due to defense counsel's failure to timely disclose Mr. Cain as a witness. In the middle of the trial, the Court heard argument on the Government's motion to exclude and defense counsel conceded that the motion should be granted. As a result, Mr. Cain's testimony was not presented to the jury. . . .

**GROUND TWO**: Mrs. Yaitsky's trial counsel rendered ineffective assistance of counsel by failing to retain a defense translator.
Supporting facts: Mrs. Yaitsky's trial attorneys were ineffective for failing to retain a defense translator. As a result, Mrs. Yaitsky was denied her right to effective assistance of counsel in violation of the Fourth, Fifth, Sixth, and Eighth Amendments to the Constitution. But for counsel's ineffectiveness, the result of the proceeding would have been different.

The main evidence relied upon by the Government at trial consisted of audio recordings of Mrs. Yaitsky and Igors Smolakovs. The recordings were in Russian. Prior to trial, the Government translated the audio recordings and provided a copy to defense counsel. However, on the eve of trial, the Government provided the defense with a second translation. The second translation – for the first time – included the word "murder" as part of the conversation between Mrs. Yaitsky and Mr. Smolakovs.

Defense counsel were ineffective for failing to obtain an independent translator immediately upon realizing that the Government intended to rely upon the audio tapes at trial. Defense counsel were further ineffective for failing to request a continuance when it was disclosed on the eve of trial that the Government had formulated a new translation of the tapes. Defense counsel should have sought a continuance to obtain an independent translator. The audio tapes were the most important evidence in this case. During the trial, the Government read the translation with the word "murder" six different times. . . .

**GROUND THREE**: Mrs. Yaitsky's trial counsel rendered ineffective assistance of counsel by failing to properly investigate the case and present witnesses at trial.
Supporting facts: Mrs. Yaitsky's trial attorneys were ineffective for failing to properly investigate the case and present witnesses at trial. As a result, Mrs. Yaitsky

4

was denied her right to effective assistance of counsel in violation of the Fourth, Fifth, Sixth, and Eighth Amendments to the Constitution. But for counsel's ineffectiveness, the result of the proceeding would have been different.

Trial counsel failed to investigate the circumstances surrounding the computer fax printout with a photo and address of Paul Milinesky and failed to call the recipient of the fax (Terry Neil) as a witness. Trial counsel also failed to properly investigate evidence establishing that Igors Smolakovs, Eduard Dambis, and Mr. Milinesky had a motive to take over Mrs. Yaitsky's business. Defense counsel did not investigate or present witnesses who would have verified that Mr. Smolakovs, Mr. Dambis, and Mr. Milinesky took steps to take over Mrs. Yaitsky's business. . . .

**GROUND FOUR**: Mrs. Yaitsky's trial counsel rendered ineffective assistance of counsel by failing to properly impeach several of the Government witnesses.
Supporting facts: Mrs. Yaitsky's trial attorneys were ineffective for failing to properly impeach several of the Government witnesses. As a result, Mrs. Yaitsky was denied her right to effective assistance of counsel in violation of the Fourth, Fifth, Sixth, and Eighth Amendments to the Constitution. But for counsel's ineffectiveness, the result of the proceeding would have been different.

Government witnesses Paul Milinesky, Igors Smolakovs, and Edward Dambis were subject to deportation and were seeking political asylum. Mani Chulpayev had been previously convicted of numerous federal crimes (at least seven counts). Moreover, at the time of trial, Messrs. Smolakovs, Chulpayev, and Dambis were facing charges relating to a stolen vehicle conspiracy ("chop shop"). They provided false information under oath. Defense counsel were ineffective for failing to properly impeach these witnesses at trial. . . .

**GROUND FIVE**: Mrs. Yaitsky's trial counsel rendered ineffective assistance of counsel by failing to present testimony and evidence to refute the testimony of Government witness Neil Tan.
Supporting facts:  Mrs. Yaitsky's trial attorneys were ineffective for failing to present testimony and evidence to refute the testimony of Government witness Neil Tan. As a result, Mrs. Yaitsky was denied her right to effective assistance of counsel in violation of the Fourth, Fifth, Sixth, and Eighth Amendments to the Constitution. But for counsel's ineffectiveness, the result of the proceeding would have been different.

The Government's expert witness from the phone company (Neil Tan) mentioned that a PIN was necessary to make long distance phone calls or send a fax from Mrs. Yaitsky's fax machine.  The Government used this statement to show that nobody except Mrs. Yaitsky could send a long distance fax from her home-office. Contrary to the Government's assertion, a PIN was not necessary to send a fax from the fax machine. Defense counsel failed to disclose this information to the jury. Defense counsel should have also informed the jury that the fax machine had a sticker with all of the necessary information for anybody to send a long distance fax.

5

Moreover, defense counsel should have informed the jury that co-conspirators Igors Smolakovs and Edward Dambis were familiar with this fax machine and sent faxes to their immigration attorneys a number of times. . . .

**GROUND SIX**: Mrs. Yaitsky's trial counsel rendered ineffective assistance of counsel by failing to investigate cell phone registration information.

Supporting facts:  Mrs. Yaitsky's trial attorneys were ineffective for failing to investigate cell phone registration information. As a result, Mrs. Yaitsky was denied her right to effective assistance of counsel in violation of the Fourth, Fifth, Sixth, and Eighth Amendments to the Constitution. But for counsel's ineffectiveness, the result of the proceeding would have been different.

Mani Chulpayev, Igors Smolakovs, and Edward Dambis (the "conspirators") had personal cell phones, but they also used two additional cell phones (843-906-4232 and 843-906-4734), which were registered under Paul Milinesky's name at Verizon Wireless (which provides free roaming in the Atlanta area). If Mr. Milinesky provided these phones to the conspirators, then he was an active part of the conspiracy against Mrs. Yaitsky. Otherwise, the conspirators performed another crime through fraudulent use of personal information of Mr. Milinesky to register two phones for a personal use. Defense counsel failed to discover the real owners of these phones (i.e., the person who paid the bills). . . .

**GROUND SEVEN**: Mrs. Yaitsky's trial counsel rendered ineffective assistance of counsel by failing to obtain all of Paul Milinesky's emails between him and Mrs. Yaitsky.

Supporting Grounds:  Mrs. Yaitsky's trial attorneys were ineffective for failing to obtain all of Paul Milinesky's emails between him and Mrs. Yaitsky. As a result, Mrs. Yaitsky was denied her right to effective assistance of counsel in violation of the Fourth, Fifth, Sixth, and Eighth Amendments to the Constitution. But for counsel's ineffectiveness, the result of the proceeding would have been different.

Paul Milinesky selected and provided to the FBI only one email from him to Mrs. Yaitsky and thirty-three emails from Mrs. Yaitsky to him. In Mrs. Yaitsky's emails, the replying subject was changed six times, which indicates that she replied (at least) to six different emails from Mr. Milinesky. It means that Mr. Milinesky sent at least six emails to Mrs. Yaitsky, and he hid from the investigation and the Court all of them except one. Defense counsel did not obtain the remaining emails, nor did defense counsel ask Mr. Milinesky why he hid a significant part of his communications from the investigation. The emails that Mr. Milinesky disclosed did not provide an accurate picture of his communications with Mrs. Yaitsky. Moreover, defense counsel failed to investigate and argue that it would have been easy for Mr. Milinesky to have altered the emails that were provided to the FBI. . . .

**GROUND EIGHT**: Mrs. Yaitsky's trial counsel rendered ineffective assistance of counsel by failing to introduce testimony and evidence regarding relevant phone conversations between Mrs. Yaitsky and Igor Kritsak and Igors Smolakovs.

Supporting facts:  Mrs. Yaitsky's trial attorneys were ineffective for failing to introduce testimony and evidence regarding relevant phone conversations between Mrs. Yaitsky and Igor Kritsak and Igors Smolakovs. As a result, Mrs. Yaitsky was denied her right to effective assistance of counsel in violation of the Fourth, Fifth, Sixth, and Eighth Amendments to the Constitution. But for counsel's ineffectiveness, the result of the proceeding would have been different.

Around noon on October 5, 2004, Mr. Kritsak, by request of Mrs. Yaitsky, called Paul Milinesky and told him that a mafia group was holding Mr. Smolakovs hostage and that Mr. Smolakovs was demanding $200,000 ransom money from Mrs. Yaitsky. Mr. Kritsak stated that because Mrs. Yaitsky was not planning on paying for his ransom, the mafia group would threaten Mr. Milinesky in order to force Mrs. Yaitsky to find the money and pay them. Mr. Kritsak testified at trial, but counsel failed to ask him to disclose this very valuable information to the jury. . . .

**GROUND NINE**: Mrs. Yaitsky's trial counsel rendered ineffective assistance of counsel by failing to raise the issue as to what happened to the $20,000 that Mrs. Yaitsky put in Igors Smolakovs' bank account.

Supporting facts: Mrs. Yaitsky's trial attorneys were ineffective for failing to raise the issue as to what happened to the $20,000 that Mrs. Yaitsky put in Igors Smolakovs' bank account. As a result, Mrs. Yaitsky was denied her right to effective assistance of counsel in violation of the Fourth, Fifth, Sixth, and Eighth Amendments to the Constitution. But for counsel's ineffectiveness, the result of the proceeding would have been different.

The FBI controlled the transfer of $20,000, which Mrs. Yaitsky put in Mr. Smolakovs' bank account on October 8, 2004. This money had gone from Mrs. Yaitsky's account, but was not introduced as evidence during the trial. The Government did not obtain this evidence money from Mr. Smolakovs' bank account. As a result, Mr. Smolakovs was able to freely use it. Thus, the Government *de facto* paid $20,000 to Mr. Smolakovs. . . .

**GROUND TEN**: Mrs. Yaitsky's trial counsel rendered ineffective assistance of counsel by failing to properly investigate this case (failing to obtain and compare fingerprints from fraudulent letters).

Supporting grounds: Mrs. Yaitsky's trial attorneys were ineffective for failing to properly investigate this case. As a result, Mrs. Yaitsky was denied her right to effective assistance of counsel in violation of the Fourth, Fifth, Sixth, and Eighth Amendments to the Constitution. But for counsel's ineffectiveness, the result of the proceeding would have been different.

The initial attack on Mrs. Yaitsky's business was mail fraud in the beginning of July 2004.  Paul Milinesky and his girlfriend (Jane Elliot) received fraudulent provocative "Magda's Budnik" letters. Neither the FBI nor defense counsel asked Mr. Milinesky about the content and appearance of the letters he received. These letters were made with the (successful) aim of destroying the personal and business relationship between Mrs. Yaitsky and Mr. Milinesky.

The FBI confirmed that the fingerprints discovered on the letters to Ms. Elliot did not match Mrs. Yaitsky. The main conspirator against Mrs. Yaitsky (Mani Chulpayev) has a history of conviction in mail fraud, but neither the FBI nor defense counsel attempted to compare the fingerprints on the letters to Mr. Chulpayev and to his co-conspirators (Edward Dambis and Igors Smolakovs). . . .

**GROUND ELEVEN**: Mrs. Yaitsky's trial counsel rendered ineffective assistance of counsel by recommending that Mrs. Yaitsky testify in English.

Supporting facts: Mrs. Yaitsky's trial attorneys were ineffective for recommending that Mrs. Yaitsky testify in English. As a result, Mrs. Yaitsky was denied her right to effective assistance of counsel in violation of the Fourth, Fifth, Sixth, and Eighth Amendments to the Constitution. But for counsel's ineffectiveness, the result of the proceeding would have been different.

Defense counsel recommended Mrs. Yaitsky testify in English, even though English is not her native language. Mrs. Yaitsky's testimony would have been clearer and more persuasive if she had been able to testify in her native tongue. . . .

**GROUND TWELVE**: During closing arguments, the prosecutor improperly argued that Mrs. Yaitsky lied; defense counsel was ineffective for failing to object to this improper closing argument.

Supporting facts: During closing arguments, the prosecutor (several times) improperly argued that Mrs. Yaitsky lied during her testimony. Mrs. Yaitsky's trial attorneys were ineffective for failing to object to the prosecutor's improper closing argument. As a result, Mrs. Yaitsky was denied her right to effective assistance of counsel in violation of the Fourth, Fifth, Sixth, and Eighth Amendments to the Constitution. But for counsel's ineffectiveness, the result of the proceeding would have been different.

The prosecutor may not refer to a defendant as a liar in closing argument. Defense counsel should have objected to this improper argument. . . .

**GROUND THIRTEEN**: During closing arguments, the prosecutor improperly used evidence about Mrs. Yaitsky's phone call to Paul Milinesky on October 4, 2004; defense counsel was ineffective for failing to object to this improper closing argument.

Supporting facts: During the closing arguments, the prosecutor improperly used evidence about Mrs. Yaitsky's phone call to Paul Milinesky on October 4, 2004. The prosecutor provided the jury with the information that Mrs. Yaitsky hung up the phone after Mr. Milinesky picked it up, which contradicted Mr. Milinesky's testimony at trial. The prosecutor was able to use this false information to secure the conviction, because Mrs. Yaitsky's trial attorneys were ineffective for failing to object to the prosecutor's improper closing argument. As a result, Mrs. Yaitsky was denied her right to effective assistance of counsel in violation of the Fourth, Fifth, Sixth and Eighth Amendments to the Constitution. But for counsel's ineffectiveness, the result of the proceeding would have been different. . . .

8

**GROUND FOURTEEN**: The cumulative effect of defense counsel's errors deprived Mrs. Yaitsky of a fair trial.

Supporting facts: All of the errors committed by counsel in Mrs. Yaitsky's case, considered either individually or together, resulted in Mrs. Yaitsky being denied a fair trial. "Where no single error or omission of counsel, standing alone, significantly impairs the defense, the district court may nonetheless find unfairness and thus, prejudice emanating from the totality of counsel's errors and omissions." *Ewving v. Williams*, 596 F.2d 391, 396 (9th Cir. 1979). . . .

(Pet.)

## A. *Strickland* standard for ineffective assistance of counsel

*Strickland v. Washington*, 466 U.S. 668 (1984), states that a meritorious ineffective assistance of counsel claim must demonstrate two things: first, that counsel's performance was deficient and, second, that counsel's deficient performance prejudiced the defense. *Id.* at 687–96. A court's evaluation of counsel's performance under this standard must be "highly deferential," so as to not "second-guess" the performance. *Id.* at 689. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Id.* (internal quotation marks and citation omitted); *see also Bowie v. Branker*, 512 F.3d 112, 119 n.8 (4th Cir. 2008); *Fields v. Att'y Gen. of Md.,* 956 F.2d 1290, 1297–99 (4th Cir. 1992); *Roach v. Martin*, 757 F.2d 1463, 1467 (4th Cir. 1985). In order to establish the second prong of *Strickland*, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability" has been defined as "a probability sufficient to undermine confidence in the outcome." *Id.*

## B. Prosecutorial Misconduct

*United States v. Mitchell*, 1 F.3d 235 (4th Cir. 1993), outlines a test for determination of

9

prosecutorial misconduct.   The defendant must prove two components: first, the defendant must show that the prosecutor's remarks or conduct were improper, and, second, the defendant must show that such remarks prejudicially affected his substantial rights so as to deprive him of a fair trial.  *Id.* at 240. The relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.  *Id.; see also United States v. Scheetz*, 293 F.3d 175, 185 (4th Cir. 2002); *United States v. Wilson*, 135 F.3d 291, 297 (4th Cir. 1998); *United States v. Francisco*, 35 F.3d 116, 120 (4th Cir. 1994).   As to the prejudice component specifically, the following factors are relevant: (1) the degree to which the prosecutor's remarks had a tendency to mislead the jury and to prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the defendant; (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters; (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel; and (6) whether curative instructions were given to the jury.  *Wilson*, 135 F.3d at 299.

## C. Ground One:  Ineffective Assistance of Counsel for "failing to timely disclose a defense expert witness."

In her petition, Petitioner claims that her trial counsel ("Trial Counsel") did not properly disclose to the Government her expert witness, Steve Cain ("Cain"). (Pet. at 10.)  The Government responds that Trial Counsel made a "sound strategic decision not to call [the expert witness]." (Gov't Response at 12.)   The Petitioner's reply cites Federal Rule of Criminal Procedure 16(b)(1)(C)("Rule 16(b)(1)(C)") and asserts that failure to comply with a federal rule cannot be

strategic.[1] (Pet's Reply at 2.)

This court assumes without deciding that failure to follow an explicit federal rule would be deficient under the performance prong. *See Strickland*, 466 U.S. at 698 ("[T]here is no reason for a court in deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed."); *see also Quesinberry v. Taylor*, 162 F.3d 273, 278 (4th Cir. 1998). Even with this assumption, Petitioner's claim fails the prejudice prong. "We must always be mindful that the standard of prejudice set out in *Strickland* requires more than just a mere possibility that the allegedly deficient performance may have prejudiced the defendant in any way." *Poyner v. Murray*, 964 F.2d 1404, 1420–21 (4th Cir. 1992). The expert's testimony in the case *sub judice* would have elicited the following pertinent information and opinions: (1) that the recording was digital; (2) that the beginning and ending of conversations were not "classic;" (3) that it does not appear to be altered; but (4) no definite statement on whether it had been altered could be made. (T-25.) In an affidavit, Trial Counsel stated,

> Several months prior to trial, counsel retained Steve Cain and notified the prosecution of the type of format Cain needed to conduct his analysis. The government provided the recordings in the requested format and these recordings were sent to Cain. After examining the recordings, Cain told counsel that the

---

[1]Petitioner claims that if trial counsel complied with Rule 16(b)(1)(C), no opportunity for Government and Cain to meet would have occurred, and thus the conversation that led to the "strategic" position not to call Cain would not have occurred. (Pet.'s Reply at 2 n.3.)   While the listed scenario was one alternate outcome, this court will not speculate on "what ifs" for purposes of determining ineffective assistance of counsel claims. *See, e.g., Sierra v. Schiro*, No. 06-350-PHX-ROS, 2008 WL 2065949 at *11 (D. Ariz. May 13, 2008) ("[P]rejudice based on speculation . . . is insufficient to establish an ineffective assistance of counsel claim under *Strickland*.).

excerpts he was provided had not been tampered with; however, he did say that it was not a classic recording.  There was not a clear beginning and ending to the recorded conversations, and he would have to examine the original recording to verify that the excerpt provided was a complete reproduction of the original recording.  He could only do this in Charleston, so we scheduled for him to come to town the day before the trial started and conduct the examination.  Judge Duffy allowed the prosecution a chance to interview Cain prior to his testimony (T-27).  After the conclusion of the interview, counsel made a strategic decision not to call Mr. Cain to testify.  Cain could not say that the recordings had been altered and could only suggest that digital recordings, generally, can be altered and that these alterations are very hard to detect.  Due to the speculative nature of his testimony, we did not feel he would be very persuasive.  In reading his latest report dated September 7, 2007, Cain outlines the same conclusion he told trial counsel verbally.  Again, there is no substance to his opinion other than that these recordings do not have a classic beginning and a classic ending.

(Trial Counsel Aff. at 1-2.)

Petitioner states that defense counsel consented to the Government' s Motion to Exclude

evidence and further asserts that while the Government describes the decision not to call Cain as a

witness "strategic," there can be nothing strategic about failure to follow the Federal Rules of

Criminal Procedure.  The following exchange occurred at trial:

> THE COURT: We now have a motion to exclude evidence filed by the Government early this morning having to do with the expert witnesses or the expert witness that was consulted last night.
> I have read the motion.  I presume the defense has received it this morning, probably a few minutes ago.
> Have you read it?
> MR. DUTREMBLE: I have, Your Honor.
> THE COURT: All right.  I've read the Government's position.
> Let me hear from the defendant.
> MR. DUTREMBLE: We consent.
> THE COURT: You what?
> MR. DUTREMBLE: I consent.
> THE COURT: You consent.  Okay.
> To what degree do we have your consent concerning the witness's testimony.
> MR. DUTREMBLE: I won't call him.

(Trial Tr. vol. 3, June 2, 2005.)

While the court agrees with Petitioner that there was nothing strategic about the failure to follow the Federal Rules of Criminal Procedure in the case *sub judice*, such a conclusion does not mean that Petitioner is entitled to relief. Pursuant to *Strickland*, even if Petitioner demonstrates that counsel's performance was deficient, she is not entitled to relief unless she further demonstrates that the deficient performance prejudiced the defense. *See Strickland*, 466 U.S. at 687-96. Furthermore, while Trial Counsel failed to comply with the rule, the record reveals that Trial Counsel decided to forego opposing the Motion to Exclude Evidence, and Trial Counsel's Affidavit indicates such a decision was made because Trial Counsel did not believe Cain would be a persuasive witness given the speculative nature of his testimony.

Trial Counsel was aware of what Mr. Cain's testimony would be: that the recording does not appear to have been altered but that "nobody can say for sure that it hasn't been altered." (Trial Tr. vol. 1, 25, May 31, 2005.) Given the speculative nature of Cain's testimony, Trial Counsel decided to consent to the Government's Motion to Exclude Evidence and indicated that Trial Counsel would not call Mr. Cain as a witness. Decisions concerning what evidence to present are tactical decisions entitled to deference. *See Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . ."); *Keel v. French*, 162 F.3d 263, 272 (4th Cir. 1998) ("To the extent that counsel discussed the case and the testimony with the experts before trial, as it appears in the record that he did, he may reasonably have concluded that, on balance, the testimony would not have been helpful during the guilt phase. This is the type of decision making by counsel that *Strickland* protects."); *Turner v. Williams*, 812 F. Supp. 1400, 1429 (E.D. Va. 1993) ("As Petitioner concedes, his attorney chose not to introduce mitigation evidence based on a concern that the prosecution's rebuttal evidence ultimately could

13

have resulted in making the issue more damaging than helpful.  Again, this is a strategic decision by counsel that *Strickland* says is owed deference by this Court."); *Squires v. Fleming*, 658 F. Supp. 800, 805 (E.D. Va. 1987) ("[T]he Court determines that trial counsel's failure to introduce . . . [certain] evidence was part of sound trial strategy.  Accordingly, these claims cannot be considered as evidencing deficient performance."); *cf. Sexton v. French*, 163 F.3d 874, 885 (4th Cir. 1998) ("Decisions that may be made without the defendant's consent primarily involve trial strategy and tactics, such as what evidence should be introduced, what stipulations should be made, what objections should be raised, and what pre-trial motions should be filed." (internal quotation marks omitted)).

Assuming failure to disclose Mr. Cain constituted deficient performance, the court concludes the deficient performance did not prejudice the defense.  Although Petitioner claims that she never "consented to any alleged strategic decision" to not call the expert, such allegation is not enough for the prejudice prong. *See Florida v. Nixon*, 543 U.S. 175, 187 (2004) (noting that the duty to consult does not require counsel to obtain defendant's consent to "every tactical decision" (citing *Taylor v. Illinois*, 484 U.S. 400, 417–18 (1988))).[2]  Indeed, after Mr. Cain's interview with the Government, Trial Counsel made the reasoned decision not to pursue the introduction of Cain's testimony, and

---

[2]While some decisions cannot be made by an attorney, including pleading guilty, waiving jury, and testifying in one's own defense, the decision of what evidence to present does not fall into the same category.  *See Jones v. Barnes*, 463 U.S. 745, 751 (1983) ("It is . . . recognized that the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether the plead guilty, waive a jury, testify in his or her own behalf, or take an appeal.); *Oliver v. Braxton*, No. 01-349-AM, 2001 WL 34633625, at *5 (E.D. Va. Nov. 8, 2001) ("[D]ecisions regarding trial tactics and strategy, such as which jurors to strike, which motions should be made, the timing of motions, whether and how to cross-examine a witness, and which evidence to present are the exclusive province of the attorney, after consultation with the client.").

14

as Trial Counsel indicated, the would-be testimony is speculative. The failure to follow the Federal Rules of Criminal Procedure thus did not prejudice the defense, and Petitioner is not entitled to relief on this claim. *See Johnson v. Texas*, 233 S.W.3d 109, 118 (Tex. App. 2007) (concluding the appellant did not meet the prejudice prong of *Strickland* because "[a]ppellant has failed to explain how, if Dr. Hirsch's excluded testimony regarding appellant's alleged lack of memory of the murder, a tangential issue at best, had been admitted during the punishment phase of the trial, the result of the punishment phase of the trial would have been different").

**D.  Ground Two: Ineffective Assistance of Counsel for "failing to retain a defense translator."**

Petitioner asserts that Trial Counsel was ineffective for failing to obtain an independent translator upon realizing, on the eve of trial, that the Government intended to rely upon a second translation that for the first time included the word "murder" as part of the conversation between Petitioner and Smolakovs. (Pet. at 6.) Petitioner further asserts counsel was ineffective in failing to request a continuance upon realization that the Government had a new translation. (*Id.*)[3] The Government responds that Trial Counsel called a certified Russian translator who was also Petitioner's daughter and effectively cross-examined the Government's witness. (Gov't Response at 13.)

While having the Petitioner's daughter act as the defense translator might not have been the

---

[3]Citing to no legal authority, Petitioner also asserts that Trial Counsel was ineffective for not sufficiently arguing that Petitioner failed to understand Smolakovs' saying "murder" because Petitioner was simultaneously talking at the time the statement was uttered. However, if Trial Counsel argued that Petitioner failed to understand Smolakovs' use of the word "murder," then the original argument that the word "murder" was not even spoken during the conversation would have been severely undermined. Trial Counsel's strategy to assert that the word "murder" was not spoken as opposed to asserting that Petitioner did not understand the word will not be second-guessed by this court. *See Hoots v. Allsbrook,* 785 F.2d 1214, 1219 (4th Cir. 1986) (stating that courts should not second-guess counsel's strategic decisions).

most prudent practice, it does not drop below the objective standard of reasonableness necessary for the performance prong of *Strickland*.  *See Burger v. Kemp*, 483 U.S. 776, 794 (1987) ("[Counsel] could well have made a more through investigation than he did.  Nevertheless, in considering claims of ineffective assistance of counsel, '[w]e address not what is prudent or appropriate, but only what is constitutionally compelled.'") (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)); *see also  Turner v. Williams*, 35 F.3d 872, 897 (4th Cir. 1994), *overruled on other grounds by O'Dell v. Netherland*, 95 F.3d 1214 (4th Cir. 1996) ("In sum, although Snook could have perhaps investigated . . . more thoroughly and with more diligence, . . . Turner has not shown that Snook's performance fell below an objective standard of reasonableness.") (internal quotation marks and citation omitted).   Furthermore, Trial Counsel ensured that there was a transcript of the conversations in the record *from one of the Government's own translators* that did not contain the word "murder."  Evidence both in the form of the testimony of Petitioner's daughter and in the form of the first transcript made by the Government questioned whether the word "murder" was in fact used in the recorded conversations.  Although Petitioner highlights that a translator not related to her would have likely been more persuasive, such argument overlooks the fact that even one of the Government's translations did not contain the word "murder."   In addition, Trial Counsel cross-examined Mr. Marder, the translator who concluded the word "murder" appeared on the tapes, as follows:

> Q.      Mr. Marder, when you reviewed these tapes, did you understand what kind of case this was?
> A.      I was previously involved in doing an interview with the victim, so, yes, I had some familiarity of the case.
> . . .
> Q.      So you knew exactly what this was, a murder for hire kind of prosecution?
> A.      Um, yes.
> . . .

Q.      You did, however, review the translations that were done back in February the 25th or earlier this year; is that correct?

A.      You are referring to the earlier transcripts?

Q.      Yes.

A.      Yes, I did.

. . .

Q.      And were you told the identity of the person who did those transcripts?

A.      Yes.

Q.      And who were you told that it was?

A.      Lisa Taylor.

Q.      And did they tell you why they needed you to go back and look at her work again?

A.      Um, it was, as I've indicated earlier today, it's standard procedure in the FBI to have a reviewer for anything of such importance, which goes outside the walls of the FBI building of the FBI for such work to be reviewed.

. . .

Q.      And her translation of the first tape, she does not find the phrase murder for hire; is that right?

A.      That's correct.

Q.      You knew what kind of case it was and you found the translation in there?

A.      I don't dispute that.

. . .

Q.      And you undoubtedly find words in this, these tapes that the first person that listened to them didn't find?

A.      You say undoubtedly. I found words that person didn't.

Q.      You said you were 100 percent sure?

A.      Correct.

Q.      And you are 100 percent sure that they weren't found in the first translations, right?

A.      That's correct.

(Trial Tr. vol. 2, 365-69, June 1, 2005.)

The court thus concludes that Petitioner has failed to show that Trial Counsel's performance was deficient: Trial Counsel ensured the transcript without the word "murder" was admitted into evidence; submitted evidence from Petitioner's daughter, a certified translator, that the word "murder" was never used in the conversations; and attempted to cast doubt upon the veracity of Marder's translation by showing he knew the case was a murder for hire case at the time he translated the tapes. Such conduct falls within the wide range of reasonable professional assistance.

17

Furthermore, counsel's decision not to call for a continuance is nothing more than a strategic decision. If additional time "would not necessarily have aided . . . [the] defense," the court will not conclude that "counsel's failure to seek a continuance fell below the objective standard of reasonableness such to constitute deficient performance." *Johnson v. Bell*, 525 F.3d 466, 488 (6th Cir. 2008).

Even if Trial Counsel's performance was deficient, Petitioner's claim would still fail the prejudice prong. The jury received two copies of the translations: the first one, interpreted by the Government's first translator, did not contain the word "murder," and the second one, interpreted by a different Government translator, did contain the word "murder." The jury could determine which translation they thought more accurately depicted the conversations. Trial Counsel received an opportunity to cross-examine the second interpreter on the different wording between the first and second translation. Providing an independent defense translator would have done nothing more than what Trial Counsel did with the original translation and effective cross-examination. Therefore, Petitioner is not entitled to relief on this ground. *C.f. Satcher v. Pruett*, 126 F.3d 561, 573 (4th Cir. 1997) (holding that not calling an independent defense witness does not equal ineffective assistance of counsel because effective cross-examination used).

**E. Ground Three: Ineffective Assistance of Counsel for "failing to properly investigate the case and present witnesses at trial."[4]**

Petitioner asserts numerous reasons why trial counsel did not properly investigate or present witnesses at trial. The court will look at each one in turn.

---

[4]The court combined all of the "failure to properly investigate" grounds into one discussion to reduce repetition.

18

<u>Failing to Investigate the Computer Fax Print-Out</u>

Petitioner claims that Trial Counsel should have investigated the circumstances surrounding a computer fax printout sent from Petitioner's home-office. (Pet. at 13.) Trial Counsel did not provide deficient assistance under this assertion. In an affidavit, Trial Counsel state this contention "has no merit for it was a strategic part of the defense case to prove that petitioner could not have sent the fax because she was not physically present at the site from which the fax was sent." (Trial Counsel Aff. at 3.) The affidavit further states that "it was counsel's strategy to focus upon the impossibility of Petitioner being the one who sent the fax, rather than trying to assume the impossible task of proving the identify of the actual sender." (*Id.*) In line with this strategy, Trial Counsel presented witnesses who testified that Petitioner was not home at the time the fax was sent. *Strickland* does not impose a constitutional requirement that counsel uncover every scrap of evidence that could conceivably help the client. *Green v. French*, 143 F.3d 865, 892 (4th Cir. 1998), *abrogated on other grounds by Williams v. Taylor*, 529 U.S. 362 (2000); *see also Emmett v. Kelly*, 474 F.3d 154, 161 (4th Cir. 2007) ("In the course of representation, 'counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" (quoting *Strickland*, 466 U.S. at 691)). Trial Counsel's strategy is within the objective standard of reasonableness. Trial Counsel were not deficient in their performance, and therefore Petitioner does not meet the *Strickland* standard.

<u>Failing to investigate the motives behind Government witnesses for testifying</u>

Petitioner argues that trial counsel should have delved more into the motives behind certain

government witnesses who wanted to take over Petitioner's business.[5] (Mem. in Supp. of Pet. at 14–15.) Petitioner asserts that Yakov Lindenbaum would have testified that Milinesky approached him regarding putting Petitioner in jail so that he could take over the business. (*Id.* at 16.) According to Trial Counsel's affidavit, Lindenbaum's version of the events did not support Petitioner's version, and his testimony would have painted an unflattering description of how Petitioner treated her employees. (Trial Counsel Aff. at 4.)  Petitioner rebuts this contention by stating that the court heard descriptions of Petitioner as an open-hearted, honest-in-business person who helped numerous people in various ways to establish their lives. (Pet.'s Reply at 8.)  Even if others' description of Petitioner are true, it does not change the fact that Petitioner cannot have this court apply hindsight techniques to find Trial Counsel deficient in its representation.   As admonished by *Strickland*, the court must regard counsel's choices with an eye for "reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments," *Strickland*, 466 U.S. at 691, particularly when evaluating decisions to not investigate further.  *See Bunch v. Thompson*, 949 F.2d 1354, 1363 (4th Cir. 1991).  "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight . . . ." *Strickland*, 466 U.S. at 689.

Precedent from the Fourth Circuit follows this reasoning.  In *Bunch v. Thompson*, trial counsel did not call a psychiatrist to testify about the defendant's childhood and mental state. *Bunch*, 949 F.2d at 1364.  The defendant filed a petition for ineffective assistance of counsel.

---

[5]In addition to the mentioned assertions, Petitioner also makes note of the digital audio recording relied upon by the Government.  However, Trial Counsel argued extensively and diligently for the exclusion of this audio recording in a motion before this court.  Whatever the Government's ultimate use for the recording was does not matter when evaluating Trial Counsel's performance.

However, the Fourth Circuit Court of Appeals found that there was no ineffective assistance of counsel because counsel made a strategic choice not to offer testimony because harmful evidence would have emerged on cross examination. *Id.* at 1364-65. The court stated, "Counsel was aware of this beneficial testimony but was also cognizant of the risks involved if the [witness] had taken the stand." *Bunch*, 949 F.2d at 1364. Noting the decision was strategic, the Court of Appeals denied defendant's ineffective assistance of counsel claim because he did not show that the "'identified acts or omissions were outside the wide range of professionally competent assistance.'" *Id.* at 1365 (quoting *Strickland*, 466 U.S. at 690).

In the case *sub judice*, Trial Counsel gave a similar reason for not calling Lindenbaum as a witness in their affidavit. (*See* Trial Counsel Aff. at 4.) Regardless of what other witnesses said about Petitioner, Trial Counsel spoke to Lindenbaum and made a judgment call that Lindenbaum would not have been helpful to Petitioner's case. "Decisions about what types of evidence to introduce 'are ones of trial strategy, and attorneys have great latitude on where they can focus the jury's attention and what . . . evidence they can choose not to introduce.'" *Wilson v. Greene*, 155 F.3d 396, 404 (4th Cir. 1998) (quoting *Pruett v. Thompson*, 996 F.2d 1560, 1571 n.9 (4th Cir. 1993)). This court cannot say that Trial Counsel's conduct goes outside the boundaries of reasonable professional judgement, and hence, the *Strickland* standard is not met.

Petitioner also complains that Trial Counsel was ineffective for failing "to properly investigate evidence establishing that Mr. Smolakovs, Mr. Dambis, and Mr. Milinesky had a motive to take over Mrs. Yaitsky's business." (Mem. in Supp. of Pet. at 15.) However, Trial Counsel elicited the following on cross examination of Mr. Smolakovs:

Q.      You also told Mr. Badger on February the 2nd, 2005, that you and Mani discussed the possibility of taking over Victoria [Yaitsky's] business once she was out of the way, didn't you?

A.      Would this cost the business itself? Yes.  We discussed the business itself, yes.

Q.      And you discussed with Mani taking over that business once Victoria was gone, right?

A.      Not her business, but the business she was involved in.

Q.      But she had to be gone before you could do that, correct?

A.      No.  We just discussed the business itself and the possibilities that might open, once she's not in it.

Q.      Once she's gone, correct?

        Okay.  And that's what this whole scam was about, wasn't it, sir?

A.      No.

Q.      Wasn't this a scam that you and Mani put together to extort money from Victoria Yaitsky and to take over her business?

A.      No.

(Trial Tr. vol. 2, 270-71, June 1, 2005.)  Furthermore, the following exchange took place when Trial

Counsel cross-examined Mani Chulpayev:[6]

Q.      Okay.  Now, part of what you discussed with Igors not only concerned the threats to make Paul leave town and your testimony that she wanted him killed, but you also discussed with Igors an opportunity for you and he to take over the business when she was gone, right?

A.      No, sir.

Q.      Didn't you tell the FBI that, sir?

A.      I said that when Igors said to me, um, when the discussion happened with the FBI, he says, what will happen to all the workers that are working for her?  And I said, Eventually, if you know how to run the business, you could open your business and run it legitimately, and that's the only thing I said.

Q.      Exactly.  He can go down there and take over the business.  And if Paul is run off to Chicago because of your threats, Paul can take over that business, can't he?

A.      No.  That wasn't even before, when Paul was in Chicago.  This was after the murder order already.

Q.      Right.

A.      That's when I discussed–that's when I told them that eventually, you and Eddie, it was both of them working for Victoria, you know.  Eventually you guys could open up a legitimate business, because I did not need to be in South Carolina.

_____

[6]At times, the court and various witnesses refer to Mani Chulpayev as "Mani," and at other times as "Chulpayev."

I had enough business in Atlanta.

Q.    Who is Eddie?

A.    Eddie was Igors's friend, who was another driver just like Eddie.

Q.    Edward Gamba, correct?

A.    Yes.

Q.    Also indicted with you in Atlanta in the chop shop?

A.    Yes.

Q.    Igors is also indicted with you in Atlanta in the chop shop, correct?

A.    Yes.

Q.    So he and Eddie have an opportunity to move in and take over a business in Charleston once Victoria Yaitsky is taken out of the picture, correct?

A.    That wasn't my intention.  I asked them to, if they want to work, that's how they could do it.

(Trial Tr. vol. 1, 101-03, May 31, 2005.)

Trial Counsel thus ensured that the jury was aware of Petitioner's assertions that her accusers were attempting to take over her business.  Trial Counsel's affidavit states,

> The jury was fully appraised of the Petitioner's assertions that her accusers were making efforts to take over her business.  Because of adverse criticisms of Petitioner's way of doing business, counsel made a tactical decision not to call any hotel managers to discuss this issue before the jury.  Their testimony would have supported the theory that Smolakovs and Dambis were trying to steal Yaitsky's clients; however, they would have depicted Petitioner as a ruthless businesswoman.

(Trial Counsel Aff. at 4.)  The court notes that Trial Counsel asked questions of both Smolakovs and Mani concerning the desire to take over Petitioner's business, and both admitted to at least some discussion of what would happen to Petitioner's clients.  Furthermore, Trial Counsel's decision not to call any other witnesses to discuss this theory was a strategic decision, and that decision does not constitute deficient performance.  *See Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . .").

### Failing to obtain and compare fingerprints from fraudulent letters

Petitioner asserts that Trial Counsel failed to obtain and compare fingerprints from fraudulent

letters sent to Milinesky and Jane Elliot. (Pet. at 28.)  According to the Petitioner, showing the government witnesses' fingerprints on the unsigned letters would prove the intent to frame her. *Id.* The Government argues that the letters were irrelevant to the defense of the case as the letters only went to show interference with a relationship between Milinesky and Elliot.  (Gov't Resp. at 27.) Petitioner replies that if Chulpayev's (a Government witness) fingerprints were found on the letter, it would have provided sufficient proof of a scheme against Petitioner. (Pet's Reply at 17.)  The court agrees with the Government.  Petitioner again seeks to employ a hindsight argument, which this court is not at liberty to employ.  *See Strickland*, 466 U.S. at 689.  In an affidavit, Trial Counsel state,

> The reason nobody asked Milinesky about the letter is that it had no relevance to the case as it was unsigned and there was no way to show authorship.  A fingerprint match would not have proved authorship; at most, it would have shown that someone handled the letter at one time. . . .  What was important to the case is the fact that Petitioner's fingerprints were not on the letter in question.

(Trial Counsel Aff. at 10-11.)  Trial Counsel's decision that the letter was irrelevant, viewed from counsel's vantage point and entitled to high deference, does not fall below an objective standard of reasonableness.  *See United States v. Adam*, 70 F.3d 776, 779 (4th Cir. 1995) (holding that trial counsel's failure to introduce evidence did not amount to ineffective assistance of counsel when trial counsel thought "no relation existed" between the evidence and the case).  Petitioner has thus not shown that counsel's performance was deficient.

**F. Ground Four: Ineffective Assistance of Counsel for "failing to properly impeach Government witnesses."**

Petitioner asserts that Trial Counsel failed to properly impeach numerous Government witnesses by not discussing at trial certain aspects of each witnesses' testimony. (Pet. at 17.)  The

Government responds that Trial Counsel engaged in strong and effective cross-examination of all of the Government's witnesses. (Gov't Resp. at 19.)  In Petitioner's Reply, she asserts that Trial Counsel "mix[ed] up" or "mischaracterize[d]" the evidence to explain their failures at impeachment. (Pet.'s Reply at 9–11.)

Counsel has an obligation to investigate possible methods for impeaching a prosecution witness, and **failure** to do so may constitute ineffective assistance of counsel. *Tucker v. Ozmint*, 350 F.3d 433, 444 (4th Cir. 2003) (emphasis added); *see also Huffington v. Nuth*, 140 F.3d 572, 580 (4th Cir. 1998).  Failure to investigate any method is distinct from failing to investigate all methods.[7] As previously noted, decisions of deficiency based on hindsight must be avoided and evaluation of counsel's performance must be made from counsel's perspective at the time of the alleged error and in light of all the circumstances.  *See, e.g., United States v. Roane*, 378 F.3d 382, 410 (4th Cir. 2004) (citing *Strickland*, 466 U.S. at 689).  Here, Trial Counsel attempted to impeach the various Government witnesses using different methods of impeachment.  On cross-examination of Mani, Trial Counsel presented evidence that Mani had been convicted of kidnapping, extortion, arson, mail fraud, and making false statements to the FBI.  (Trial Tr. vol. 1, 103-04, May 31, 2005.)  Trial Counsel also got Mani to admit that he lied to his federal probation officer.  (Trial Tr. vol. 1, 111-13, May 31, 2005.)  The jury heard Mani admit that he was not going to be prosecuted for kidnapping Milinesky because he "got a pass."  (Trial Tr. vol. 1, 105, May 31, 2005.)  Mani further admitted that he had been indicted for "running a chop shop and changing the VIN numbers there" and that the FBI found out about this indictment against him from a source other than Mani.  (Trial Tr. vol.

---

[7]In fact, Petitioner argues for this distinction in a separate ground, stating that "there is a huge semantic difference" between the words "all" and "any." (Pet.'s Reply at 19 n.15.)

1, 99-101, May 31, 2005.)

On cross-examination of Igors Smolakovs, Smolakovs admitted he was indicted along with Mani and Eduard Dambis in a nineteen-count indictment, charging him with stealing automobiles and operating a chop shop by changing identification numbers on those automobiles.  (Trial Tr. vol. 2, 243-44, June 1, 2005.)[8]  The following exchange also occurred:

> Q.      Now, Mr. Badger asked you whether or not he had made any promises to you about your charge that's pending in Atlanta, correct?
> A.      He didn't make me any promises.
> Q.      Well, he didn't tell you he wouldn't help you, did he?
> A.      He just didn't mention anything at all about it.
> Q.      So it's up to him whether he helps you or not, correct?
> A.      Why should he help me?
> Q.      Why should he help you? Because you are facing a lot of jail time, aren't you, sir?
> A.      I don't know why he should help me.

(Trial Tr. vol. 2, 247-48, June 1, 2005.)  Smolakovs further admitted that when he went to the FBI, he "didn't mention some details," such as the kidnapping on October 4.  (Trial Tr. vol. 2, 249, June 1, 2005.)  He testified that he withdrew $20,000 of the $40,000 deposited into his account on October 1, 2004, but that he only turned $10,000 of this $20,000 over to the FBI.  (Trial Tr. vol. 2, 255-56, June 1, 2005.)  Smolakovs also admitted that he lied to the Assistant United States Attorney, Mr. Badger:

> Q.      You remember meeting with Mr. Badger on February the 2nd of 2005, correct?
> A.      Yes.
> Q.      He came to Atlanta to visit you?
> A.      Yes.
> Q.      And you told this jury that you met with Mr. Badger and you told him the whole story, right?

---

[8]At Yaitsky's trial, however, Smolakovs did not actually admit to stealing cars.  (Trial Tr. vol. 2, 254, June 1, 2005.)

26

> A.   Not initially, um, because initially, I did not mention Paul's kidnapping.
> Q.   Initially, you lied to Mr. Badger, didn't you?
> A.   Well, it looks like it.
> Q.   It does, doesn't it?
> A.   Yes.

(Trial Tr. vol. 2, 268, June 1, 2005.)

On cross-examination, Eduard Dambis admitted that he had been indicted along with Smolakovs and Mani in a nineteen-count indictment. (Trial Tr. vol. 3, 396-97, June 2, 2005.) He also admitted that he participated in the kidnapping and that he knew it was against the law. (Trial Tr. vol. 3, 399-400, June 2, 2005.) When asked whether he denied involvement in the kidnapping, the following exchange occurred:

> A.   Yes, because I did not participate in the kidnapping, I just knew about it.
> Q.   But you rented the car, didn't you?
> A.   Yes.
> Q.   And you bought the tape recorder, correct?
> A.   Yes.
> Q.   You didn't tell the FBI about that, either, did you?
> A.   About what?
> Q.   About purchasing the recorder.
> A.   I don't recall exactly. I probably just didn't think about telling.

(Trial Tr. vol. 3, 401, June 2, 2005.)

The court concludes that Trial Counsel properly investigated the methods for impeaching these Government witnesses. Trial Counsel presented evidence concerning the witnesses' pending charges and addressed instances where the witnesses either lied or failed to tell the complete truth. The fact that other methods for impeachment existed does not mean that Petitioner received ineffective assistance of counsel. Trial Counsel did not fail to investigate methods of impeachment; Trial Counsel merely chose which methods they believed to be most effective for trial. Petitioner's suggestions of better ways to impeach the Government witnesses do not prove that Trial Counsel's

27

actual methods were below an objective standard of reasonableness.[9]  *See Hoots v. Allsbrook*, 785 F.2d 1214, 1221 (4th Cir. 1986) (noting that although the attorney breached his duty to investigate possible methods for impeaching the prosecution's witness, the *Strickland* standard for ineffective assistance of counsel was not satisfied, stating, "Had Roark been convicted of perjury or another crime that directly called into question the reliability of her testimony, we might find that Hoots had shown a reasonable probability that but for the failure to impeach, the outcome of the trial would have been different.  The failure to use worthless check convictions to impeach Roark does not give rise to a comparable implication of Roark's testimonial untrustworthiness, however."); *see also Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002) ("Decisions about 'whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature' and generally will not support an ineffective assistance claim." (quoting *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987)); *Johnson v. Hofbauer*, 159 F. Supp. 2d 582, 607 (E.D. Mich. 2001) ("Impeachment strategy is a matter of trial tactics, and tactical decisions are not ineffective assistance of counsel simply because in retrospect better tactics may have been available.").

**G.  Ground Five: Ineffective Assistance of Counsel for "failing to present testimony and evidence to refute the testimony of Government witness Neil Tan."**

Essentially asserting a similar claim as presented in earlier Grounds, Petitioner asserts that

---

[9] Petitioner makes particular note of the testimony of Dambis in relation to a meeting between Petitioner and Milinesky.  Petitioner claims that Trial Counsel mischaracterized the evidence to state that Dambis did not give a specific date of the meeting and did not describe the meeting as confrontational.  Regardless of how Petitioner feels the Trial Counsel characterized the evidence, the transcript shows Trial Counsel fully cross-examined Dambis to attack his credibility in front of the jury.  Petitioner's argument that she would have presented the evidence differently does not make Trial Counsel deficient.  What Trial Counsel did not miss is "just as (or more) important as what [Trial Counsel] missed."  *Roane*, 378 F.3d at 411 (quoting *Coe v. Bell*, 161 F.3d 320, 342 (6th Cir. 1998)).

28

Trial Counsel did not disclose to the jury evidence which would refute the contention that a PIN number was necessary to send a fax. (Pet. at 20-21.) The Government responds that effective cross-examination took place in regards to Tan and that information Petitioner uses for her argument was unknown to Trial Counsel at the time of trial. (Gov't Resp. at 20.) Petitioner replies that one of her Trial Counsel knew about this information prior to trial. (Pet.'s Reply at 12.) Petitioner also states that Trial Counsel provided the jury with incorrect statements regarding the use of the PIN number. (Pet.'s Reply at 13.)

A reading of the transcripts indicate that Trial Counsel's attempt to refute the testimony regarding the need for the PIN was adequate for the circumstances and did not go outside the range of reasonableness. Trial Counsel cross-examined Tan about the use of the PIN as follows:

> Q. Mr. Tan, how do you know Victoria Yaitsky called that number?
> A. Um, each subscriber is assigned a member number, and, um, we have, um, in our computers the caller I.D., A and I, the caller I.D., which identifies that business. This member number is also assigned to Ms. Yaitsky.
> Q. The only thing you know, Mr. Tan, is that the member number comes up, correct?
> A. Yes. Member number.
> Q. And there is no prohibition in the contract that Ms. Yaitsky signs with you against allowing somebody else to use that member number, correct?
> A. No.
> Q. So anybody that has her member number can call and get your service, correct?
> A. Anybody that has her PIN number.
> Q. Her PIN number, correct?
> A. Yes.
> Q. And we don't know how many people she might have allowed access to that PIN, do we?
> A. We don't.
> Q. We don't know.
> So all you can tell this jury is that somebody with access to the PIN number called that particular telephone number on the day in question, correct?
> A. Yes.
> Q. And we don't know that it was her, do we?
> A. We don't.

(Trial Tr. vol. 2, 330-31, June 1, 2005.)  This cross-examination went straight to the issue of whether anyone besides Petitioner could have sent the long-distance fax from her home office.  Furthermore, Petitioner herself testified about the PIN number:

> Q.     So your fax machine has the long distance number and PIN programmed in it?
> A.     The number itself has a PIN programming through the company.  Even if it's not a fax machine, if you do the regular form, 556, and dial the calling card number, 1-800 number, you don't need to enter the PIN for it.  It asks for the number.  For my home phone number, it's necessary to put the PIN number.

(Trial Tr. vol. 3, 526, June 2, 2005.)

Petitioner is essentially arguing that Trial Counsel should have presented additional evidence concerning the PIN number and her assertion that a PIN number was not required in order to send the fax.  The court concludes, however, that Trial Counsel's performance in this regard was not deficient: counsel got Neil Tan to concede on cross-examination that he could not testify that Petitioner sent the fax at issue, and Yaitsky herself testified about the PIN number associated with the 1-800 number.  Furthermore, as discussed above, Trial Counsel also presented evidence that Petitoner could not have sent the fax as she was nowhere near the fax machine at the time the fax was sent.  Thus, while Petitioner might now wish counsel had presented additional evidence, the court concludes Trial Counsel's performance was objectively reasonable and therefore not deficient.

## H. Ground Six: Ineffective Assistance of Counsel for "failing to investigate cell phone registration information."

Petitioner asserts that Trial Counsel should have delved more deeply into investigating where the cell phones were registered to prove that Milinesky was part of the setup against Petitioner or to discredit a key Government witness with another fraud. (Pet. at 22.)  The Government asserts that Petitioner ignores the fact that Trial Counsel spent a  "significant time at trial tying phones and calls

to . . . Milinesky in an effort to show that he was part and parcel of the efforts to frame Petitioner."

(Gov't Resp. at 21.)

As previously noted, this court shows great deference to trial counsel's decisions regarding strategy and tactics used during trial. Trial Counsel's tactics in this instance do not fall below the standard of reasonableness. Trial Counsel used the cell phones to show that Milinesky played a part in the setup of Petitioner, so that Petitioner would not be guilty of the crimes charged. The following exchange occurred during Mani's cross-examination:

> Q.      Okay. Can you tell the members of the jury, please, sir, how you managed to call 69 times telephone numbers in Paul's name after the kidnapping?
> A.      I have no idea what you are talking about, sir.
> Q.      Let me show you what I'm talking about.
>       These are your toll records, sir, which the Government has stipulated are accurate. Why don't you take a look and make sure that your telephone number appears on those records.
>       Do those appear to be your toll records, sir?
> A.      It's my phone number.
> . . .
> Q.      All right. These are telephone calls made by your phone, right?
> A.      Yes.
> Q.      This is your bill, right?
> A.      I guess.
> . . .
> Q.      . . . Do you see that number there 906-4232, area code (843)?
> A.      Yes, sir.
> Q.      Who is that?
> A.      I don't remember.
> Q.      You don't remember.
>       Do you know whether or not that number is a telephone number listed to Paul Milinesky?
> A.      No, I don't.
> Q.      You do not?
> A.      Hum-um.
> Q.      Would you deny it if I told you that number was called 50 times–
> A.      Yes.
> Q.      –between this date and by the time we get to Page 268?
> A.      Yes, sir.
> Q.      You would deny it?

A.     Yes, sir.

. . .

Q.     To make this quicker, you do not deny that 906 number is called from your telephone on more than one occasion after the kidnapping, do you?

A.     Not by me.

Q.     Not by you?

A.     Not by me.  If this, in fact, calls the number, it wasn't me.

Q.     But this is your telephone, correct?

A.     It is my telephone.

(Trial Tr. vol. 1, 128-31, May 31, 2005.)[10]  Furthermore, while cross-examining Milinesky, Trial Counsel asked him how certain cell phone numbers showed up on Mani's toll records, implying that numbers registered to Milinesky showed up on Mani's records.  (Trial Tr. vol. 1, 184, May 31, 2005.)  Trial Counsel also asked Milinesky whether he kept his old cell phone number after he was kidnapped "so that Mani and Igors in Atlanta could continue to contact you," but his response was "No."  (Trial Tr. vol. 1, 186, May 31, 2005.)

While Petitioner may now wish that additional evidence had been presented, the court concludes Trial Counsel's performance was not deficient.  Trial Counsel clearly put before the jury Petitioner's theory that Paul Milinesky was part of a conspiracy to frame Petitioner, and as Trial Counsel notes in their affidavit, counsel spent a significant amount of time "tying phones and calls to Paul Milinesky in an effort to show that he was part and parcel of the effort to frame Petitioner." (Trial Counsel Aff. at 7.)  Thus, any decision on the part of Trial Counsel not to introduce additional evidence on this matter was a strategic one, and the court concludes Trial Counsel's actions did not fall below an objective standard of reasonableness.  *See Meyer v. Branker*, 506 F.3d 358, 371 (4th

---

[10]Milinesky testified that several items owned by the business DniPro were put into his name, including some vehicles, apartments, and several cell phones.  (Trial Tr. vol. 1, 165-66, May 31, 2005.)  He further testified that he only used his personal cell phone and that all the other cell phones were used by people employed by DniPro, as well as Petitioner's son.  (Trial Tr. vol. 1, 166, May 31, 2005.)

Cir. 2007) ("It is a cardinal tenet of the Supreme Court's ineffective assistance jurisprudence that "'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" (quoting *Strickland*, 466 U.S. at 690)); *accord Medearis v. United States*, 469 F. Supp. 2d 779, 787 (D.S.D. 2006)("The fact that there is a difference of opinion as to the trial tactics employed by counsel . . . does not constitute ineffective assistance.").

## I. Ground Seven: Ineffective Assistance of Counsel for "failing to obtain all of Milinesky's emails between him and Yaitsky."

Petitioner asserts that the hidden emails disclosed Milinesky's role in the conspiracy against her. (Pet. at 23-24.) She argues that Trial Counsel should have obtained the hidden emails and asked Milinesky why he hid those emails. *Id.* The Government and Trial Counsel respond that the emails only showed Petitioner's obsession with Milinesky and that there is no merit to the claim that the emails would have exposed Milinesky's role in the conspiracy. (Gov't Resp. at 22.)

Notwithstanding whether counsel's conduct was reasonable,[11] Petitioner fails to establish prejudice under *Strickland*'s second prong. Even if the emails from Milinesky were brought forth, Petitioner fails to show how there is a reasonable probability that the rest of the proceedings would have been different. Petitioner cites to no content from the emails which would have actually exposed Milinesky's alleged role in the conspiracy. A footnote in her petition mentions nine topics discussed in those emails, none of which exposes Milinesky as a participant in the alleged conspiracy. (*See* Pet. at 23, n.17.) Petitioner fails to demonstrate that the ultimate outcome of the case would have been different if those emails had been brought forth. Even if the six other emails

---

[11]Because this court finds that Petitioner was not prejudiced, there is no necessity in discussing the performance prong.

from Milinesky to Petitioner were uncovered, it would not have undermined the fact that Petitioner

sent thirty-three emails to Milinesky which the Government used only to show her obsession with

him.[12]  The fact that Trial Counsel decided not to question Milinesky about missing emails, a point

they viewed as irrelevant, can only go to Trial Counsel's strategy.  *See Hoots*, 785 F.2d at 1219

(stating that courts should not second-guess counsel's strategic decisions).  Furthermore, Petitioner's

assertion that the undiscovered emails would have disclosed Milinesky's role in the conspiracy

against Petitioner is entirely speculative and cannot serve as a basis for a claim of ineffective

assistance of counsel.  *Cf. Jones v. Polk*, 401 F.3d 257, 269-70 (4th Cir. 2005) (concluding the

district court did not abuse its discretion in refusing to conduct an evidentiary hearing because

"Jones presents only conclusory and speculative allegations as support for his request for an

evidentiary hearing.").

**J. Ground Eight: Ineffective Assistance of Counsel by "failing to introduce testimony and
evidence regarding relevant phone conversations between Yaitsky and Igor Kritsak and
Smolakovs."**

Petitioner asserts that Igor Kritsak had information (listed in an affidavit attached to her

petition) that Trial Counsel should have elicited from him during his testimony. (Pet. at 25.)  Trial

Counsel asserts that Kritsak never shared this information with them and that the first time Trial

Counsel learned of this information was from the petition. (Trial Counsel Aff. at 9.)  Petitioner

replies that she told Trial Counsel during a pre-trial meeting and was told it was "not significant."

---

[12]It is, perhaps, also worth noting that while the court does not base its decision on this point, it seems extremely unlikely that an email exchange between Milinesky and Petitioner would disclose Milinesky's alleged role in a conspiracy against Petitioner.  If Milinesky was in fact attempting to frame Petitioner, it is unclear why his emails to her would in fact reveal such a plan.

(Pet.'s Reply at 15.)  Following the deference this court must place on Trial Counsel's actions, the court concludes counsel's actions do not constitute ineffective assistance of counsel.

Trial Counsel did call Igors Kritsak as a witness, and Kritsak testified that on the afternoon Milinesky was kidnapped, he went home, had dinner, and spoke with Milinesky's mother.  (Trial Tr. vol. 3, 481-82, June 2, 2005.)  After speaking with Milinesky's mother, Kritsak testified that he called Yaitsky, and at some point that evening, Yaitsky called the police.  (Trial Tr. vol. 3, 483, June 2, 2005.)  There is no testimony, however, that around noon on October 5, 2004, Kritsak, by the request of Yaitsky, called Milinesky and told him that a mafia group was holding Smolakovs hostage and that Smolakovs was demanding $200,000 ransom money from Yaitsky.  Kritsak's attached affidavit indicates that he stated because Yaitsky was not planning on paying for his ransom, the mafia group would threaten Milinesky in order to force Yaitsky to find the money and pay them.  In her petition, Yaitsky indicates that "[h]ad the jury been informed that Mr. Milinesky was forewarned by Mrs. Yaitsky about Mr. Smolakov's plot, this information would have confirmed that Mrs. Yaitsky did not have plans to hurt Mr. Milinesky."  (Mem. in Supp. of Pet. at 25.)

Petitioner is essentially asserting that Trial Counsel was ineffective for failing to present certain evidence that, according to her, counsel had.  Decisions such as what evidence to present at trial are strategic decisions not subject to challenge.  *See Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . ."); *Squires v. Fleming*, 658 F. Supp. 800, 805 (E.D. Va. 1987) ("[T]he Court determines that trial counsel's failure to introduce . . . [certain] evidence was part of sound trial strategy.  Accordingly, these claims cannot be considered as evidencing deficient performance."); *cf. Sexton v. French*, 163 F.3d 874, 885 (4th Cir. 1998) ("Decisions that may be made without the

defendant's consent primarily involve trial strategy and tactics, such as what evidence should be introduced, what stipulations should be made, what objections should be raised, and what pre-trial motions should be filed." (internal quotation marks omitted)). Furthermore, while Yaitsky indicates she told Trial Counsel about this telephone conversation between herself and Kritsak, there is no evidence Kritsak acknowledged such conversation at the time of Yaitsky's trial.

Petitioner additionally asserts that Trial Counsel was ineffective for failing to present evidence regarding a phone conversation between herself and Smolakovs[13] and not allowing her to testify regarding her reasoning behind paying Smolakovs the money. (Pet. at 26.) The Government responds that Petitioner testified at trial as to why she felt scared and why she paid Smolakovs the money. (Gov't Resp. at 24.)

Trial Counsel did question Petitioner about her phone conversations with Smolakovs and during her testimony, she refers to "weird conversations starting Tuesday, Wednesday, and Thursday"[14] where Smolakovs told her that "[the mob] will kill him and Paul." Petitioner claims she did not believe Smolakovs because she "knew [Paul] was alive." The transcripts were unclear at times as Petitioner would begin to go into tangents during questioning, often times answering much more than the question asked. However, "where the record is incomplete or unclear about . . . actions, we will presume that [counsel] did what he should have done, and that he exercised

---

[13] This court notes that Petitioner's claim here seems aimed at the FBI more than Trial Counsel. The bulk of this claim revolves around Petitioner feeling it was ironic that the FBI had no record of the phone conversation or the set-up of the crime scene in relation to the phone conversation. She only gives one sentence about how trial counsel was "ineffective for failing to present this information to the jury."

[14] Trial transcripts indicate that the Monday previous to the three listed days was October 4th, 2004, indicating that Thursday would have been the October 7th phone call listed in Petitioner's claim.

reasonable professional judgment." *Williams v. Head*, 185 F.3d 1223, 1228 (11th Cir. 1999). Numerous cases hold that introduction of evidence is trial strategy for purposes of ineffective assistance of counsel claims. *See Byram v. Ozmint*, 339 F.3d 203, 209 (4th Cir. 2003) ("[R]eview of counsel's strategic decisions as to which evidence to present at trial is highly deferential.") (internal quotation marks omitted); *see also Meyer v. Branker*, 506 F.3d 358, 374 (4th Cir. 2007) (holding that failure to present testimony not ineffective assistance of counsel); *McHone v. Polk*, 392 F.3d 691, 705 (4th Cir. 2004) (same); *Peterson v. Murray*, 904 F.2d 882, 888 (4th Cir. 1990) (finding no ineffective assistance of counsel for failing to present evidence supporting nonmeritorious issues). This court concludes the evidence here should be treated any differently from the evidence in the cited cases. Because Trial Counsel's actions in questioning Petitioner about the alleged phone conversation with Smolakovs was within reasonable judgement, the claim of ineffective assistance of counsel fails.

**K. Ground Nine: Ineffective Assistance of Counsel for "failing to raise the issue as to what happened to the $20,000 that Yaitsky put in Smolakovs' bank account."**

Petitioner asserts that if Trial Counsel disclosed the fact that the Government did not obtain the final payment of money ($20,000) from Smolakovs' bank account, then the outcome of the trial would have changed. (Pet. at 27.)

There is a discrepancy between the Government and Petitioner as to the actual issue. Petitioner claims that the real issue is that the Government knowingly allowed Smolakovs to keep the money in evidence, while the Government argues the issue based on Smolakovs hiding part of the money in evidence for his own use. Regardless of the description of the issue, Trial Counsel was not deficient in their representation because they sufficiently attacked Smolakovs' credibility.

Smolakovs admitted on cross-examination that he kept half of the original payment for his

37

own use, only handing over to the FBI $10,000 of the original $20,000. (Trial Tr. vol. 2, 255-57, June 1, 2005.) In addition, on cross-examination of the FBI Agent ("Agent"), Trial Counsel discussed the Agent's failure to pursue the whereabouts of the remaining $10,000. (Trial Tr. vol. 2, 315-17, June 1, 2005.) This court re-iterates that Trial Counsel is not required to discuss every piece of evidence brought to its attention. *See Byram*, 339 F.3d at 209; *Green,* 143 F.3d at 892. Although Trial Counsel did not bring up the last payment of $20,000 during his cross-examination of Smolakovs or the Agent, the record establishes that counsel's actions in discussing the $10,000 went to proving the same thing that discussion of the $20,000 could prove - Smolakovs' credibility.[15]

Notwithstanding the performance prong, Petitioner has not met the prejudice prong. Trial Counsel cross-examined Smolakovs on various issues relating to his credibility - pending federal charges, motives for testifying, and associations with other witnesses – with the jury present. (Trial Tr. vol. 2, 254-57, June 1, 2005.) There is no reasonable probability that, but for Trial Counsel not bringing up the additional $20,000 issue, that the outcome of the case would have changed - the jury already heard a significant amount of evidence that cast doubt upon Smolakov's credibility. The court therefore concludes that Petitioner is not entitled to relief on this claim.

**L. Ground Eleven: Ineffective Assistance of Counsel for "recommending that Yaitsky testify in English."[16]**

Petitioner and Trial Counsel differ on why Petitioner testified in English. According to Trial Counsel, Petitioner decided prior to trial that she would testify in English. (Trial Counsel Aff. at 12.)

---

[15]Trial Counsel brought up the final payment of $20,000 during his closing argument and used it as a reasonable inference that Igors scammed the FBI out of more than just the $10,000.

[16]Ground Ten concerned Trial Counsel's failure to obtain and compare fingerprints from fraudulent letters. This contention was addressed under Ground Three.

Petitioner, however, claims that she only did so upon advice of Trial Counsel because Trial Counsel said the jury would have a better impression of her. (Pet.'s Reply at 18.)  Regardless of why Petitioner testified in English, she fails to meet the *Strickland* standard for ineffective assistance of counsel.

If Petitioner decided to testify in English herself, then she cannot claim ineffective assistance of counsel because her ultimate result was not satisfactory. *Cf. United States v. Adam*, 70 F.3d 776, 779 (4th Cir. 1995) (finding no ineffective assistance of counsel for failure to call neighbor as witness when appellant insisted that neighbor not be "dragged into the case.").  If Petitioner decided to testify in English on advice of Trial Counsel, she still has no claim for ineffective assistance of counsel.  As admitted in her Reply, Petitioner claims that Trial Counsel told her that she should testify in English so that the jury "would have a better impression of her." (Pet.'s Reply at 18.)  This clearly falls within the trial strategy realm where this court will not second-guess Trial Counsel's actions. *Hoots,* 785 F.2d at 1219.  For Petitioner to now claim that she should have testified in her native language is a hindsight determination and not based on the facts and circumstances known to Trial Counsel at the time of the trial.  Because Trial Counsel's actions fall within the standard of reasonableness, Trial Counsel were not deficient.

## M.  Ground Twelve: Prosecutorial Misconduct by "arguing that Yaitsky lied" and Ineffective Assistance of Counsel for "failing to object to this improper closing argument."

If no improper closing argument exists, then Trial Counsel cannot have given ineffective assistance of counsel by failing to object to it; the court therefore begins by looking at whether prosecutorial misconduct exists. *See Moore v. U.S.* (*Moore I*), 934 F. Supp. 724, 727 (E.D. Va. 1996) ("Because the trigger for an ineffective assistance claim is an unprofessional error or mistake by

39

counsel, the *Strickland* analysis of the claim properly begins with the identification of the error or mistake.").

Petitioner makes a broad statement that a prosecutor may not call a defendant a liar in closing argument, citing to only one case in a separate circuit.[17]  (Pet. at 31.)  The court concludes such a blanket statement is incorrect.  A thorough discussion of the use of the word "liar" in a prosecutor's closing argument is found in *Moore I*.  The district court in Virginia suggested that the Fourth Circuit's chief concern over the use of word liar was the context in which the term is used.  *Moore I*, 934 F. Supp. at 728.  "The line between permissible and impermissible use of the term[] is drawn by reference to whether they are used in a context intended either to convey a prosecutor's personal opinion or to suggest the government's possession of extra-judicial information regarding the credibility of a defendant or witness."  *Id.* at 729.  While using the term "liar" excessively and intemperately could amount to improper argument, no Fourth Circuit panel at that time had ever found use of the word "liar" in closing arguments to be reversible error.  *Id.* at 729; *see also United States v. Cooper*, 827 F.2d 991, 995 (4th Cir. 1987) (using the term "liar" was improper, but "not reversible error.").

In the case *sub judice*, the prosecutor used the word "liar," or some derivative of it, in twelve lines during a closing argument lasting twenty-three pages.  The prosecutor made such statements as "I do know she lied to you," "I know they were lies," and "[t]hat is a lie and we know it." (Trial Tr. vol. 4, 631-33, June 3, 2005.) The court assumes such statements were improper.  In *United States v. Moore* (*Moore II*), 11 F.3d 475 (4th Cir 1993), the Fourth Circuit held that the prosecutor's

---

[17]Petitioner cites to the reasoning of the Ninth Circuit in *United States v. Garcia-Guizar*, 160 F.3d 511 (9th Cir. 1998), to show that the prosecutor's comments were improper. (Pet. at 31.)

statement that "the government knows" the defendant lied was clearly impermissible, as using the phrase could easily be "interpreted by jurors to mean that the government knew facts about the defendant's testimony that were not presented at trial." *Moore I*, 934 F. Supp. at 730 (discussing *Moore II*); *see also United States v. Rogers*, 853 F.2d 249, 251 (4th Cir. 1988) (finding prosecutor's reference to defendant as a liar, thief, crook and a disease as improper but did not affect the defendant's substantial rights given the strength of the Government's case); *Cooper*, 827 F.2d at 995 (chastising prosecutor for calling the defense witnesses "liars").

The court now turns to the question of whether Trial Counsel was ineffective in failing to object to the closing argument. Petitioner claims that Trial Counsel should have objected to the use of the word "liar." However, "[m]any objections, while not lacking in technical merit, are either not worth making or may reasonably be viewed as likely to cause more harm if made than if foregone." *Moore I*, 934 F. Supp. at 727. The record shows conflicting testimony between Petitioner's version of the events and other witnesses recollections. Trial Counsel may have believed that it is "better to remain silent than to draw attention to a matter by offering an objection." *Id*. In fact, the Fourth Circuit stated that whether counsel "simply didn't think to object or deliberately did not object" did not matter. *Inge v. Procunier*, 758 F.2d 1010, 1016 (4th Cir. 1985).[18] The court thus concludes counsel's failure to object was a reasonable trial tactic, falling within a standard of reasonable objectiveness.

---

[18]The court notes the circumstances of the failure to object were unique in *Inge*. The court stated, "An objection [to the presence of the guns in the courtroom] could only have called the guns to the jury's additional attention. A motion to exclude the guns from the courtroom could have resulted only in the Commonwealth's Attorney correcting his inadvertence and caused him to have the guns admitted." *Inge*, 758 F.2d at 1016.

**N.  Ground Thirteen: Prosecutorial Misconduct for "improperly us[ing] evidence about [a] phone call" and Ineffective Assistance of Counsel for "failing to object to closing argument."**

In a slightly different claim, Petitioner asserts that the prosecutor improperly used evidence concerning a phone call between herself and Milinesky, and because Trial Counsel did not object, she received ineffective assistance of counsel. (Pet. at 32-33.)   Petitioner must show that the arguments were improper and that the improper argument "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  The Fourth Circuit requires the court to consider "numerous factors, which include the nature of the prosecutorial misconduct, the extent of the improper conduct, the issuance of curative instructions from the court, any defense conduct inviting the improper prosecutorial response, and the weight of the evidence."  *Humphries v. Ozmint*, 397 F.3d 206, 218 (4th Cir. 2005) (internal citations omitted); *see also Boyd v. French*, 147 F.3d 319, 329 (4th Cir. 1998) (holding that a prosecutorial misconduct determination requires the court to look at the nature of the comments, the nature and quantum of the evidence before the jury, the arguments of opposing counsel, the court's charge, and whether the errors were isolated or repeated); *United States v. Harrison*, 716 F.2d 1050, 1052 (4th Cir. 1983) (four factors to be considered in determining whether remarks amounted to prosecutorial misconduct: (1) degree to which remarks misled jury and prejudiced defendant; (2) whether remarks were isolated or extensive; (3) whether absent remarks, competent evidence established guilt; and (4) whether comments were deliberately placed before the jury to divert attention to extraneous matters).  Finally, it is undisputed that closing argument is not merely a time for a recitation of uncontroverted facts; the prosecution may make fair inferences from the evidence. *United States v. Francisco*, 35 F.3d 116, 120 (4th Cir.

42

1994); *see also United States v. Brainard*, 690 F.2d 1117, 1122 (4th Cir. 1982) ("The closing arguments of counsel are limited to the facts in evidence and reasonable inferences flowing therefrom.").

Petitioner cites *Shih Wei Su v. Filion*, 335 F.3d 119, 126-27 (2nd Cir. 2003), for the proposition that the prosecutor is not allowed to use tweaked evidence. (*See* Mem. in Supp. of Pet. at 33.) However, the court agrees with the Government that *Shih Wei Su* is inapposite to the present case in one material aspect. In *Shih Wei Su*, the crux of the matter was that the prosecutor allowed a witness to commit perjury on the witness stand and did not attempt to correct the false testimony. *See Shih Wei Su*, 335 F.3d at 126-27. The fact that the prosecution bolstered the perjured testimony during summation only went to show further improper behavior. *Id.* at 127. In the instant claim, perjured testimony by a government witness is not at issue; the issue here is whether counsel was ineffective for failing to object to the Government's statements during closing argument about specific testimony.

The main issue stems from the following statement in the Government's closing argument: "She calls him, doesn't talk to him, but calls him, and learns he's still alive." Petitioner correctly states that Milinesky testified that he did not answer the phone when Petitioner called. (Trial Tr. vol. 1, 169, May 31, 2005.) The Government also correctly states that Agent McTavish testified that Milinesky told the agent on October 5th that he answered the phone and no one responded (Trial Tr. vol. 3, 410, June 2, 2005.). Hence, the Government stating in summation that "she calls him, doesn't talk to him, but calls him, and learns he's still alive" is not a misstatement of the evidence, as there was in fact evidence that Milinesky answered the phone. The Government then makes the inference that because of this phone call, Petitioner took back the money paid for Milinesky to be killed. It is

a fact that Petitioner removed the money from the bank very shortly after the phone call to Milinesky occurred. (Trial Tr. vol. 3, 546, June 2, 2005.)  It is a reasonable inference for the Government to make a connection existed between the phone call to Milinesky and the removal of the money.  The court therefore concludes that the prosecutor's statements were proper, and as a result, Petitioner has not shown that Trial Counsel's performance was deficient in failing to object to the prosecutor's statements.

Even if the remarks were improper, this court does not find that it was prejudicial to Petitioner for Trial Counsel to fail to object to the Government's statements.  The record contains additional evidence, that, if believed, revealed that Petitioner had a hand in the crime.  In addition, the court concludes the jury instructions properly informed the jury to rely on their own memory of the evidence.  Before closing arguments, the court stated, "The lawyers attempt to sum up for you and tie together the evidence as they view it as it came in.  It's up to you to remember it and apply it to find what the facts are."  (Trial Tr. vol. 4, 611, June 3, 2005.)  During the jury charge, the court reiterated, "If the facts as you remember them differ from the way the lawyers recall them or stated them to you, your memory must control.  I hasten to add, no lawyer would intentionally misstate anything to you.  But if your recollection of the testimony differs from theirs, you must accept your own recollection."[19] (Trial Tr. vol. 4, 665, June 3, 2005.) The court therefore concludes Petitioner has not demonstrated she is entitled to relief on this ground.

---

[19]Additionally, the court said, "you must decide which testimony to believe and which testimony not to believe," "you need to consider, therefore, whether a contradiction is an innocent lapse of memory or an intentional falsehood.  And that may depend on whether it has to do with an important fact or only a small detail," and "[t]he determination of the facts in this case rest solely with you, as jurors." (Trial Tr. vol. 4, 667-69, June 3, 2005.)

**O.  Ground Fourteen: The cumulative effect of Trial Counsel's errors deprived Yaitsky of a fair trial.**

Finally, Petitioner asserts that the errors, considered collectively, resulted in her being denied a fair trial.  (Pet. at 34.)  Petitioner cites to two out-of-circuit cases for support of this theory.  However, Fourth Circuit precedent does not allow this court to consider these claims collectively in this case.  In *Fisher v. Angelone*, 163 F.3d 835 (4th Cir. 1998), the court held that ineffective assistance of counsel claims must be viewed individually rather than collectively.  *Id.* at 852; *see also Arnold v. Evatt*, 113 F.3d 1352 (4th Cir. 1997) (rejecting a request to review the alleged errors cumulatively rather than individually).  "Having just determined that none of counsel's actions could be considered constitutional error, it would be odd, to say the least, to conclude that those same actions, when considered collectively, deprived [defendant] of a fair trial."  *Fisher*, 163 F.3d at 852.  Because this court concludes Petitioner has not established a viable claim of ineffective assistance of counsel on any of her individual claims, the court concludes she has not established the cumulative effects of the alleged errors deprived her of a fair trial.

## CONCLUSION

It is therefore **ORDERED**, for the foregoing reasons, that the Government's Motion for Summary Judgment is **GRANTED**.  It is further **ORDERED** that Yaitsky's Motion to Vacate, Set Aside, or Correct Sentence is **DENIED**.

   **AND IT IS SO ORDERED**.

PATRICK MICHAEL DUFFY
United States District Judge

**Charleston, South Carolina**
**August 17, 2008**